UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

TRAMAINE T. KINARD,

                              Plaintiff,

– against –

**NOT FOR PUBLICATION**

**MEMORANDUM & ORDER**

TOWN OF GREENWICH,
CONNECTICUT, GREENWICH POLICE
DEPARTMENT, OFFICER MICHAEL M.
HALL Badge # 147, OFFICER RYAN
BEATTIE Badge # 141, OFFICER C.
ROSARIO, SERGEANT JAMES D.
SMITH, CHIEF OF POLICE JIM
HEAVEY, and other UNKNOWN
OFFICERS, DETECTIVES,
SERGEANTS, LIEUTENANTS,
CAPTAINS of the GREENWICH POLICE
DEPARTMENT,

21-cv-474 (ERK)(SJB)

                              Defendants.

KORMAN, *J*.:

        Tramaine Kinard, an employee of New York City's Administration of
Children Services, spent ten days incarcerated, including eight at Rikers Island, for
a crime he did not commit. This miscarriage of justice was the result of the actions
of officers of the Greenwich Police Department, who turned a blind eye to evidence
of Kinard's innocence, resulted in him spending Thanksgiving—not with family and
friends—but instead imprisoned on Rikers Island.

On January 28, 2021, Kinard filed this lawsuit against the Town of Greenwich, the Greenwich Police Department ("GPD"), and several Greenwich police officers. ECF No. 1. Defendants moved to dismiss the complaint. ECF No. 27. I denied the motion to dismiss without prejudice, subject to renewal after Kinard filed an amended complaint. ECF No. 35. On September 10, 2021, Kinard amended his complaint. ECF No. 37. The amended complaint Kinard filed alleges claims against the Town of Greenwich, the GPD, and several Greenwich police officers under 42 U.S.C. § 1983 for false arrest and imprisonment and due process violations. *Id.* ¶¶ 134–95. Kinard also alleges state common law claims (it is unclear of what jurisdiction) for malicious prosecution and false imprisonment, as well as claims against the Town of Greenwich, the GPD, and the GPD police chief alleging negligent training, hiring, retention, and supervision. *Id.* ¶¶ 196–210. Defendants move for summary judgment or, alternatively, to dismiss the amended complaint. ECF No. 44-1. Kinard also moves for summary judgment or, alternatively, for a judgment on the pleadings, but only as to his § 1983 pretrial detention claim. ECF No. 45-1. There is subject matter jurisdiction over Kinard's federal civil rights claims under 28 U.S.C. §§ 1331, 1343, and over his state law claims under 28 U.S.C. § 1367.

Pending before me at oral argument of those motions were, inter alia, a motion for summary judgment filed by the defendants, the Greenwich police officers and

the Town of Greenwich. I granted the motion with respect to each of the defendants except Officer Michael M. Hall and Sergeant James D. Smith. I denied the motion as them without prejudice to renew because there were factual issues that needed further discovery. After I rendered my oral ruling, as reflected on the docket, those defendants filed a notice of appeal based on a denial of qualified immunity. This opinion was being drafted at the time. *See* ECF No. 55 Oral Arg. Tr. at 40:19-41:5. I file it now in aid of the appeal in the event that the notice of appeal operated to affect my jurisdiction. *See United States v. Nichols*, 56 F.3d 403, 411 (2d Cir. 1995).

## FACTUAL BACKGROUND[1]

I begin with the facts of this troubling case. At 1:30 P.M. on October 30, 2019, officers Michael Hall, Ryan Beattie, and C. Rosario of the GPD arrived at a post office in Greenwich, Connecticut to investigate money order fraud. ECF Nos. 37-2 ¶ 2; 45-2 ¶¶ 3, 5. When they arrived, the officers noticed a dark Infiniti sedan with Pennsylvania license plates parked illegally in a commercial loading zone. ECF Nos. 37-2 ¶ 4; 45-2 ¶ 5. The vehicle aroused the officers' suspicion because it was similar

---

[1] The summary of the facts principally relies on the Defendants' 56.1 Statement, the Plaintiff's Response to that statement, and the Defendants' Statement of Additional Facts. ECF Nos. 44-2; 45-2; 46-1 at 30–31. While the Defendants have submitted a Reply 56.1 Statement, ECF No. 46-1 at 2-30, I decline to consider it because "Local Rule 56.1 does not permit the filing of reply 56.1 Statements." *G.S. v. Pleasantville Union Free Sch. Dist.*, 2020 WL 4586895, at *1 n.2 (S.D.N.Y. Aug. 10, 2020). Indeed, "[a] reply Rule 56.1 Statement is 'a procedurally improper attempt to have the last word in a manner that is not contemplated by the local rules.'" *Id.* (quoting *Killis v. Cabela's Retail II, Inc.*, No. 13-cv-6532, 2015 WL 128098, at *1 (N.D. Ill. Jan. 8, 2015)).

to a car that police believed might have been involved in a money order fraud scheme in a neighboring town the day before. ECF Nos. 37-2 ¶ 6; 45-2 ¶ 1–2.

The GPD officers observed in the vehicle "a single black male wearing dark colored sweat pants, a black sweatshirt, and a black beanie style head cap" for about fifteen seconds, as he was "reclined very far back in his seat as if to secrete himself from passing foot traffic." ECF No. 37-2 ¶ 5. As the man exited the car and walked around the corner into a post office parking lot, the GPD officers checked the vehicle's registration and were informed by dispatch that it was expired. ECF Nos. 37-2 ¶ 7; 45-2 ¶¶ 7–8. The man then caught sight of the GPD officers and, though the officers were in plain clothes, he immediately got back into the vehicle. ECF No. 45-2 ¶ 8. In a declaration in support of defendants' motion for summary judgment— although not in his affidavit in support of the arrest warrant—Officer Hall asserted that he observed that the man had a "distinct discoloration on his forehead." ECF No. 44-3 ¶ 9.

Officers Hall and Beattie then walked toward the vehicle. ECF No. 37-2 ¶ 8. As the officers approached, the officers loudly identified themselves and ordered the occupant to turn off the car. ECF No. 37-2 ¶ 11. Instead of complying with the GPD officers' demands, the car's occupant sped into the roadway, nearly striking the officers with the car. ECF Nos. 37-2 ¶ 12; 45-2 ¶¶ 10–11.

The suspect eluded police, driving recklessly and committing multiple traffic infractions along the way, as he headed southbound on Interstate 95 toward New York. ECF Nos. 37-2 ¶¶ 17–26; 45-2 ¶¶ 13–14. After the suspect escaped, Officer Hall contacted the New York Police Department ("NYPD") for information about the vehicle. ECF Nos. 37-2 ¶¶ 27–28; 45-2 ¶ 15. The NYPD confirmed that license plate readers "hit on the vehicle" at approximately 5 P.M. in Canarsie, Brooklyn. ECF Nos. 37-2 ¶ 28; 45-2 ¶ 16. NYPD records also indicated that this vehicle had been stopped in New York City for three separate moving violations between October 2018 and February 2019. ECF No. 37-2 ¶ 28; *see also* ECF No. 44-10 at 3. During each stop, "the operator was ticketed and identified by his NY driver's license as Tramaine Kinard by NYPD officers." ECF No. 37-2 ¶ 28; *see also* ECF No. 44-10 at 1.

Later that same day, Officers Hall and Beattie telephoned Kinard, who was employed as a food delivery driver for the New York City Administration of Children's Services ("ACS"). ECF Nos. 37-2 ¶ 30; 45-2 ¶¶ 21, 28. This position required him to deliver meals in a van to children at juvenile detention centers. ECF No. 45-2 ¶ 28; *see also* ECF No. 45-9 ¶¶ 9–12. During the telephone call, the officers asked Kinard if he had been in Greenwich earlier that day. ECF No. 37-2 ¶ 30. Kinard responded that he had never been to Greenwich, that he had worked all day, and that he had proof that he was at work. *Id.* When Officer Beattie asked Kinard if he drove

an Infiniti, Kinard responded that he did not own a car, that he lost a driver's license in 2017, and that someone must have been using his former license to drive their own car and accumulating tickets in his name. ECF Nos. 37-2 ¶ 30; 45-2 ¶ 25; *see also* ECF No. 37 ¶¶ 76, 125. Officer Hall then asked Kinard to email a current photograph of himself. ECF No. 37-2 ¶ 31. Kinard sent the photograph, along with a New York State driver's license that was issued in August 2018 and his ACS ID card which contained his photograph. ECF Nos. 37-2 ¶ 31; 45-2 ¶ 22; 45-12.

A week later, on November 6, 2019, Officer Hall contacted Kinard and requested that he come to the Greenwich Police Department for an interview. ECF Nos. 37-2 ¶ 32; 45-2 ¶ 27. The next day, Hall was contacted by Kinard's attorney Allan Friedman, who informed Hall that Kinard would not come to Greenwich for an interview. ECF Nos. 37-2 ¶ 33; 45-2 ¶ 27. Despite knowing that Kinard worked at ACS, Officer Hall then contacted Bradley Howard, an employee of the NYC Department of Investigation ("DOI"), to verify Kinard's whereabouts on October 30, 2019. ECF Nos. 44-13 at 2; 45-2 ¶ 29. Investigator Howard audited Kinard's timesheet for October 30, 2019 and found that it "indicated" that he had worked from 7:00 A.M. to 3:30 PM on that day. ECF No. 44-13 at 1; *see* ECF No. 45-2 ¶ 30. Investigator Howard was not immediately able to obtain Kinard's field sheet to confirm this. ECF Nos. 44-13 at 1; 45-2 ¶ 30.

On November 12, 2019, Officer Hall executed an application for an arrest warrant for Kinard. ECF No. 45-2 ¶ 32. In the application, Officer Hall addressed Kinard's purported alibi with the following representation:

> At this time Kinard's alibi for the time of this incident remains that he was at work all day in New York City. The undersigned contacted the NYC Department of Investigations (DOI), who are responsible for investigating NYC employee misconduct. The DOI was able to confirm that Kinard had clocked into work that morning, but there are no records or witnesses at this time who are able to confirm his alibi during the work day. It should be noted that Greenwich is an approximately 1 hour drive from Brooklyn, NY where Kinard works. It would not be difficult to complete the round trip during work hours and return prior to the end of the shift.

ECF No. 37-2 ¶ 34. Officer Hall also stated that "[t]he photographs [that Kinard had emailed to Hall] were … consistent with the male observed operating the Infiniti that fled from GPD officers." ECF No. 37-2 ¶ 31; *see* ECF No. 44-3 ¶ 9. Officer Hall represented that "NYPD records indicated that the [Infiniti] had been stopped in their jurisdiction on the following dates[:] October 5, 2018 [at Bruckner Boulevard and Pugsley Avenue in the Bronx], December 4, 2018 [at Bowery and Canal Street in Manhattan], and February 6, 2019 [at Grand Central Parkway and Clearview Expressway in Queens] … [and that] [d]uring each of these stops, the operator was ticketed and identified by his NY driver's license as Tramaine Kinard by NYPD officers." ECF Nos. 37-2 ¶ 28; 44-10 at 3.

The arrest warrant was signed by Judge John Blawie of the Superior Court for the State of Connecticut on November 18, 2019, and bail was set at $100,000,

allegedly at the GPD officers' request.[2] ECF Nos. 37 ¶¶ 79–80; 45-2 ¶ 32; 45-26 at 3. On November 20, Officer Hall contacted Friedman and informed him that there was an active warrant for Kinard's arrest. ECF Nos. 44-15 at 1; 45-2 ¶¶ 33–34. Over the next few days, Kinard refused to turn himself in. ECF Nos. 44-16 at 1; 45-2 ¶ 36. This decision, which Kinard attributes to his attorney's advice, appears to have been unwise, because if Kinard turned himself in, he would have been arraigned before a judge in Connecticut, and probably released on a substantially lower bail— as he ultimately was when he later appeared before Judge Blawie. *See* ECF No. 45-3 ¶¶ 41–43.

The consequence of this decision was that on November 25, a week after the arrest warrant was signed, Officer Hall telephoned officers from the NYPD, requesting that they detain Kinard, and sent the NYPD a letter of detainer, along with a copy of the arrest warrant. ECF Nos. 44-16 at 1; 45-2 ¶ 40; 45-28. That same day, Kinard was arrested by NYPD officers inside his home in Brooklyn, New York. ECF No. 45-2 ¶¶ 41, 65. He was arraigned on the detainer in Kings County Criminal Court in Brooklyn (where he waived extradition). ECF Nos. 45-2 ¶ 66, 68–70; 45-

---

[2] Officer Hall and Sergeant Smith deny having any involvement in the amount of bail set for Kinard. *See* ECF Nos. 44-3 ¶ 29; 44-4 ¶ 7. And Connecticut State's Attorney Paul J. Ferencek submitted a declaration stating that, in the ordinary course, "bail is set on warrants at the sole discretion of the judge reviewing the warrant … without any input from prosecutors," except in "rare instances, such as in serious felony cases, or where a suspect is likely to flee." ECF No. 52 ¶ 2. These declarations do not rule out the possibility that, in this case, Judge Blawie asked the Assistant State Attorney for his view on the bail amount.

14; 45-17 at 2:14–15. Because there was a warrant for Kinard's arrest in Connecticut, the judge refused to set bail, stating that she did not "have the authority to do anything other than remand." ECF No. 45-14 at 6:12–13. Kinard then spent the night in the Brooklyn Detention Center. ECF No. 45-2 ¶ 42.

On November 26, 2019, Kinard was transferred to the New York Department of Corrections facility on Rikers Island. *Id.* ¶¶ 42–43, 75. That same day, the Legal Aid Society attorney who represented Kinard at his arraignment, Nahal Batmanghelidj, called Officer Hall and Sergeant James Smith and informed them that she had exculpatory evidence. ECF No. 44–3 ¶ 27. Attorney Batmanghelidj then sent an email to the Kings County District Attorney's Office and the GPD with Kinard's ACS October 30, 2019 timesheet and a photograph of a hand-written visitor register showing that Kinard had signed into a building at 1:15 P.M. and signed out at 1:30 P.M. ECF Nos. 45-2 ¶¶ 44–45, 87; 45-9 at 5; 45-25 at 1–4; *see also* ECF Nos. 50–51. The visitor register in the photograph does not indicate where it is from, but as noted below, Kinard's attorney told Greenwich Assistant State Attorney Steven Weiss in a phone call the following day that it was taken from the Crossroads Juvenile Center in Brooklyn. Attorney Batmanghelidj requested that Kinard's arrest warrant be vacated. ECF No. 45-2 ¶ 46. Sergeant Smith called Weiss and advised him of the foregoing documents provided by Attorney Batmanghelidj and the request to vacate the warrant, but Weiss advised him that the warrant would not be vacated

based on these documents and that "due process would occur." ECF Nos. 44-18 at 1–2; 45-2 ¶¶ 47–48.

On November 26, 2019, Kinard also obtained a new attorney, Joseph Reiter, who reached out to Weiss to request a reduction in Kinard's bail. ECF Nos. 37 ¶ 95–96; 45-4 ¶¶ 1, 42–43, 106. Reiter attests that he "spoke via telephone with the Kings County ADA Jannette Morales-Lukowsky … [who] stated that her office would agree to reduced bail, [] but that any reduction required the consent of the prosecuting attorney in Connecticut, Steve Weiss." ECF No. 45-4 ¶ 105. Morales-Lukowsky also "agreed to call [] Weiss and ask him to consent to reduced bail." *Id.* On November 27, 2019, Kings County ADA Morales-Lukowsky informed Attorney Reiter that Weiss "would not consent to bail in any amount less than $100,000." ECF No. 45-4 ¶ 107. Reiter talked to Weiss by phone that same day and pointed him to both the time sheet and the handwritten visitor register, which Reiter explained was from Crossroads Juvenile Center where Kinard had been making a delivery, showing that Kinard had signed in at 1:15 P.M. and out at 1:30 P.M. (the same time as the criminal incident), as indisputable evidence that Kinard was at work when the crime was committed. ECF No. 45-4 ¶ 108. According to Reiter, Weiss stated that "he would not consent to reducing bail, based on assurances from the Greenwich Police Department that they had positively identified [Kinard] as the person who had committed the offenses charged"—assurances that conflicted with Officer Hall's

statement in the arrest warrant that the photographs of Kinard were merely "consistent with the male observed" committing the crimes, as well as the mounting evidence that Kinard was working in Brooklyn at the time of the crime. ECF Nos. 37-2 ¶ 29; 45-4 ¶ 109.

On December 2, 2019, Officer Hall contacted NYC DOI investigator Howard, regarding the evidence provided by Kinard's previous attorney Batmanghelidhj. ECF No. 45-2 ¶ 50. Hall asked Howard if there was "any video footage or more reliable source to confirm [Kinard's] alibi that day?" ECF No. 44-14. Investigator Howard said that he "d[id not] know if there [wa]s a camera at [Kinard's] work location." *Id.* He also stated that "it may be possible for an employee to record their time by computer the next day or at a later time if they are not in the office." *Id.*

On December 4, 2019, Kinard was transported from Rikers Island to Connecticut by GPD officers. ECF No. 45-2 ¶¶ 53, 76; *see also* ECF No. 45-3 ¶ 51–52. On December 5, 2019, Kinard appeared before Judge Blawie in Connecticut Court to be arraigned on the arrest warrant. ECF No. 45-2 ¶ 54. At the arraignment, the Bail Commissioner stated that Kinard: (1) had been residing at the same residence in New York for the past ten years, (2) was working full time, (3) had 13 years of education, and (4) did not have a criminal record. ECF No. 37-9 at 1:17–26. The Bail Commissioner recommended to Judge Blawie that Kinard be released on his own recognizance in lieu of bail, stating that "the Office of the Bail

Commissioner respectfully request a written promise to appear with the conditions of no driving without valid license, registration, and insurance."[3] *Id*. Assistant State Attorney Weiss, argued that "some substantial bond" was appropriate because Kinard was "alleging an alibi that the Greenwich police are investigating." *Id*. at 2:2–9. Kinard's attorney then outlined the evidence that supported Kinard's alibi. *Id*. at 2:23–3:18. After that presentation, Judge Blawie asked Weiss whether the state was "conceding … a legitimate issue of identification." *Id*. at 3:19–20. Weiss responded, "I honestly don't know. It was … an issue that was raised by [Kinard] through counsel in New York. I have Greenwich police working on it but I don't have … any indication one way or the other from them." *Id*. at 3:21–26. In response, Judge Blawie reduced Kinard's bail to "a ten thousand dollar bond with a ten percent cash option"—effectively $1,000. *Id*. at 4:7–9. Kinard's family immediately posted the $1,000 bond, and Kinard was released that same day. ECF Nos. 45-3 ¶ 61; 45-2 ¶ 55.

On January 10, 2020, the charges against Kinard were dismissed after his attorney provided the Connecticut Assistant State's Attorney with additional evidence that he was working at the time of the incident. ECF No. 45-2 ¶ 59. That evidence included (1) an affidavit from Kinard's supervisor attesting to the fact that

---

[3] A Connecticut Bail Commissioner's responsibilities include making "recommendations on request of any judge, concerning the terms and conditions of the release of arrested persons from custody pending final disposition of their cases." Conn. Gen. Stat. § 54-63b(a).

Kinard was at work at ACS on October 30, 2019 and providing details of his whereabouts between 7:00 A.M. and 3:45 P.M on that day; (2) an affidavit from an administrative manager of ACS further supporting Kinard's alibi; (3) a certified visitor register showing that Kinard signed in at Crossroads Children's Juvenile Center, located in Brooklyn, at 9:45 A.M.; (4) another certified visitor register from Crossroads Children's Juvenile Center, indicating that Kinard signed in at 1:15 P.M. and signed out at 1:30 P.M. (which Attorney Batmanghelidj had already provided to Officer Hall on November 26, 2019); and (5) time stamped video surveillance footage showing Kinard at Crossroads Juvenile Center between 1:13 and 1:34 P.M. ECF No. 37 ¶ 118.

## LEGAL STANDARD

In deciding a motion for summary judgment under Federal Rule of Civil Procedure 56, the judge "must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" *Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.*, 11 F.4th 55, 61 (2d Cir. 2021) (quoting *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012)). Summary judgment is warranted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of fact exists when there is sufficient 'evidence

on which the jury could reasonably find for the plaintiff.'" *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

## DISCUSSION

### I.   Unlawful Identification Procedures (Count 1)

The amended complaint alleges that the defendants violated Kinard's due process rights by identifying him "as the person who had committed the alleged offenses based on a single photograph." ECF No. 37 ¶ 138–39. In the defendants' motion for summary judgment, they contend that this claim fails as a matter of law because a suggestive identification alone does not necessarily amount to a constitutional violation. *See* ECF No. 44-1 at 12–13.

Kinard does not address the defendants' arguments in his briefing. *See* ECF Nos. 45-1; 47. Nor does Kinard otherwise argue that his challenged identification procedures claim should proceed. *Id.* And, given Kinard's allegations that GPD officers deliberately misrepresented that they had positively identified Kinard as the suspect, Kinard's injury in this case does not arise from the "suggestiveness" of the GPD's identification procedures. *See* ECF No. 37 ¶¶ 101–106, 138–44. Under these circumstances, Kinard has abandoned his unlawful identification procedures claim. *See Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial

opposition that relevant claims or defenses that are not defended have been abandoned."); *see also* ECF No. 46 at 5–6. The motion to grant summary judgment to the defendants on the unlawful identification procedures claim is granted.

## II. Pretrial Detention (Count 2)

### A. Prolonged Detention Claim

The amended complaint alleges a § 1983 claim for prolonged detention on the basis that the defendants violated Kinard's due process rights by unreasonably detaining him for ten days. ECF No. 37 ¶¶ 145–75. Both the defendants and Kinard have moved for summary judgment on this claim. *See* ECF No. 44-1 at 13–24; 45-1 at 16–26.

In *Baker v. McCollan*, 443 U.S. 137, 144 (1979), after holding that a negligent failure to investigate cannot provide the basis of a cause of action against law enforcement officers, the Court nevertheless assumed that a person accused of a crime cannot "be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was [originally] arrested and detained met the standards of the Fourth Amendment." *Id*. Based on this assumption, the Second Circuit held that a § 1983 claim is viable against law enforcement officers under the Fourth Amendment for unreasonably prolonged pretrial detention under certain specified circumstances. *See Russo v. City of Bridgeport*, 479 F.3d 196, 209 (2d Cir. 2007). Indeed, as Judge Calabresi observed in *Russo*, "that the right mentioned in

*Baker* … protect[s] [plaintiff] from a sustained detention stemming directly from the law enforcement officials' refusal to investigate available exculpatory evidence." *Id*. at 208. In that case, the prolonged detention occurred because, as described in *Russo*:

> The Bridgeport police officers retained sole custody of the videotape evidence—and stored it in an improper manner—for a full 68 days after Russo alerted them that examining the pictures of the perpetrator for tattoos could exonerate Russo. They did this after intentionally misstating that the robber had tattoos. Moreover, their failure to perform the simple task of checking the tape resulted in all of Russo's 217–day incarceration.

*Id*.

*Russo* held that three factors are relevant to determining whether the plaintiff's prolonged detention rises to the level of a Fourth Amendment violation: (1) the length of time of the wrongful incarceration; (2) the ease with which the evidence exculpating the defendant—which the officers had—could have been checked; and (3) the alleged intentionality of the defendants' behavior. *See id.*, 479 F.3d at 209; *see also Ying Li v. City of New York*, 246 F. Supp. 3d 578, 622 (E.D.N.Y. 2017) (summarizing the *Russo* factors).

There is no set "bright-line rule" for what length of time constitutes an unreasonably prolonged detention. *Gonzalez v. New York City*, 2016 WL 7188147, at *4 (S.D.N.Y. Dec. 2, 2016). In *Baker*, the Supreme Court held that "a detention of three days over a New Year's weekend" was insufficient.[4] 443 U.S. at 145. The ten

---

[4] The plaintiff in *Baker* was in fact detained for five days preceding the New Year's weekend. 443 U.S. at 141. The majority excluded that period from its analysis without explanation,

days Kinard spent incarcerated—one day in Brooklyn, eight days in Rikers Island, and one day in Connecticut—is longer than the three-day period that was too short in *Baker* but is not as long as the 68-day period held to be "prolonged" in *Russo*. ECF No. 45-2 ¶¶ 74–76; *Russo*, 479 F.3d at 209. While the length of Kinard's detention in comparison to the detention in *Russo* may be a factor that weighs in favor of holding that Kinard's detention did not violate his Fourth Amendment rights, a ten-day period of incarceration, eight days of which were spent suffering in the brutal conditions of Rikers Island, is not so short that it definitively cannot rise to the level of a constitutional violation.[5] Indeed, the Ninth Circuit has held that a jury could reasonably find that "a twelve-day incarceration" was a prolonged detention in violation of a plaintiff's constitutional rights. *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002); *see also Harewood v. City of New York*, 2012 WL 12884356, at *6 (E.D.N.Y. Feb. 10, 2012) ("A jury could find that five days of unlawful incarceration was an unreasonable length of time."); *Gonzalez*, 2016 WL

---

apparently because of special circumstances, which suggests that eight days may have been sufficient for an unreasonably prolonged detention claim. *Id.* at 144–46.

[5] Rikers Island is "an isolated, dilapidated, and dangerous penal colony [that] has no place in today's New York City." Indep. Comm. on N.Y.C. Crim. Just. & Incarceration Reform, *A More Just New York City*, 125 (2017). The New York City Council has become so troubled by Rikers Island's "chronic violence and decrepit facilities" that it voted in October 2019 to close it by 2026. Daniel Trotta, *New York City Council Votes to Close Infamous Rikers Island Jails*, Reuters, Oct. 17, 2019 (https://www.reuters.com/article/us-new-york-rikers-idUSKBN1WW2ZW).

7188147, at *5 (four days of detention was "an—arguably—unreasonable amount of time").

In arguing that Kinard's ten-day detention was reasonable, the defendants make much of the fact that Kinard was detained in New York and had to then be extradited to Connecticut before he could be released. *See* ECF No. 44-1 at 18–19. They argue that since Kinard's transportation to Connecticut occurred within the 30 days required by New York law, the length of his detention was reasonable. *See People v. Frank*, 123 N.Y.S.3d 421, 431–32 (N.Y. Crim. Ct. 2020). But Kinard's prolonged detention claim is based on GPD's efforts to keep Kinard detained with bail set at $100,000 even though he was not a flight risk and in the face of mounting evidence of his innocence—not any failure of the defendants to comply with New York extradition law. *See* ECF 37 ¶¶ 169–75. Since the defendants do not allege that Kinard would have had to be transported to Connecticut for him to be released, or, at the very least, for a reasonable amount of bail to be set, it is irrelevant whether the GPD transported Kinard from New York to Connecticut in a reasonable amount of time.

Indeed, when Kinard was arraigned in Brooklyn on the detainer sent by the defendants, he waived extradition—placing himself "in the same position as if a Governor's Warrant had been issued against [him]." ECF No. 44-17. At that point, only Connecticut—not New York—had the power to evaluate the merits of the

charges against Kinard and determine whether bail should be lowered, or he should be released based on the exculpatory evidence Kinard's attorneys had provided. *See New Mexico, ex rel. Ortiz v. Reed*, 524 U.S. 151, 153–54 (1998); *United States ex rel. Vitiello v. Flood*, 374 F.2d 554, 556 (2d Cir. 1967). In fact, Kings County ADA Morales-Lukowsky informed Kinard's attorney that she could not set Kinard's bail lower than $100,000 without the consent of Greenwich Assistant State Attorney Weiss. ECF No. 45-4 ¶¶ 105, 108.

While Kinard's waiver of extradition meant that New York was charged with delivering Kinard "forthwith" to Connecticut agents, presumably when they came to take custody of him, this waiver procedure is not "an exclusive procedure" nor does it "limit the powers, rights or duties of [Connecticut] officers." N.Y. Crim. Proc. L. § 570.50. Indeed, Kinard was picked up in Kings County by GPD officers and then transported to Connecticut. ECF 45-4 ¶ 112. Under these circumstances, the extent to which the defendants complied with New York law in transporting Kinard to Connecticut is irrelevant to Kinard's constitutional prolonged detention claim.

Since a prolonged detention claim can be brought even when the plaintiff was arrested pursuant to a warrant, the plaintiff must demonstrate under the second *Russo* factor the existence of "readily available" exculpatory evidence that the defendants "mishandl[ed] or suppress[ed]." *Russo*, 479 F.3d at 205, 209; *see also Baker*, 443 U.S. at 147–8 (Blackmun, J., concurring). Here, within a day of Kinard's arrest, one

of Kinard's attorneys provided the defendants with a handwritten visitor register, which Kinard's attorney advised Weiss was from Crossroads Juvenile Center in Brooklyn, showing that Kinard signed into the Center at 1:15 P.M. and out at 1:30 P.M. ECF Nos. 45-2 ¶¶ 44–45, 87; 45-9 at 5; 45-25 at 1–4. Because the crime Kinard allegedly committed occurred at 1:30 P.M. in Greenwich, Connecticut, this evidence provided a very persuasive basis for Kinard's alibi. ECF No. 45-2 ¶¶ 3, 5. Moreover, none of the photographs that Kinard submitted in response to Officer Hall's request prior to his application for the arrest warrant depict Kinard as having the "distinct discoloration on his forehead" that Officer Hall stated in his declaration that he observed on the suspect in Greenwich. ECF Nos. 44-3 ¶ 9; 45-12.

The defendants contend that Kinard has failed to demonstrate that exculpatory evidence was mishandled or suppressed, as required by *Russo*, 479 F.3d at 205, because Kinard "never furnished evidence to police at any time that conclusively established his innocence." ECF No. 44-1 at 19. But this is not the correct standard. Under *Russo*, a plaintiff need only show that an officer failed in his "duty to investigate specific, readily-verifiable claims of innocence in a reasonable time period." 479 F.3d at 209. In other words, the plaintiff's burden is to demonstrate that "the defendant-officer, by expending reasonable cost and effort, could have conclusively established the plaintiff's innocence"—not that the plaintiff himself provided the police with such evidence while he was incarcerated. *Thompson v. City*

*of New York*, 603 F. Supp.2d 650, 656 (S.D.N.Y. 2009). Here, the day after Kinard was detained, Kinard's attorney called the defendants and provided them with a visitor register showing that Kinard had signed in for a kitchen pickup at the exact time the crime was committed. ECF No. 49-2 at 2. While it may have not been immediately clear from the email or the image where the visitor register was from, *see* ECF No. 44-14, it would have taken minimal effort on the part of the defendants to clarify with Kinard's attorneys the location of the visitor register—Crossroads Juvenile Center—and then verify the legitimacy of the register with the Center. Indeed, on November 27, 2019, two days after Kinard was first detained, Kinard's attorney Joseph Reiter alleges that he told Greenwich Assistant State Attorney Weiss directly that the visitor register was from Crossroads Juvenile Center in Brooklyn, New York—more than 30 miles from the crime scene in Greenwich, Connecticut. ECF No. 45-4 ¶ 108.

But instead of following up on this exculpatory evidence, the defendants did nothing for almost a week until Officer Hall emailed NYC DOI investigator Howard to tell him that Kinard's attorney had sent a copy of Kinard's timesheet and "a picture of a visitor register dated 10/30/2019 from an unknown location." ECF No. 44-14. At no point did Officer Hall or the other defendants reach out to Kinard's attorneys or his supervisors to ask where the picture of the visitor register was from. *See* ECF

Nos. 49; 50. Nor did Officer Hall even attach the picture of the visitor register to his email to DOI investigator Howard. ECF No. 44-14.

The picture of the visitor register in the defendants' possession should have enabled the defendants, with reasonable effort, to verify that Kinard was in Brooklyn, New York—not Greenwich, Connecticut—at the time of the incident. But the defendants instead allowed Kinard to sit in prison for eight more days without making any effort to verify the legitimacy of the visitor register. This suggests that the defendants purposefully violated their "duty to investigate specific, readily-verifiable claims of innocence in a reasonable time period." *Russo*, 479 F.3d at 209. Indeed, because a simple phone call or email would have clarified the location of the visitor register and, by proxy, Kinard's location at the time of the incident, the second *Russo* factor—the ease with which the exculpatory evidence in the officers' possession could have been checked—weighs in Kinard's favor. *See Russo*, 479 F.3d at 209; *see also Harewood*, 2012 WL 12884356, at *7 (summary judgment denied on a prolonged detention claim where an officer failed to investigate a plaintiff's alibi that he was at work at the time of the stabbing).

The final factor—"the alleged intentionality of [the defendants'] behavior"— also strongly favors Kinard. *Russo*, 479 F.3d at 209. On November 7, 2019, Kinard's attorney informed the GPD that Kinard would not come to Greenwich for an interview. ECF Nos. 37-2 ¶ 33; 45-2 ¶ 27. But the GPD waited days—until

November 12—to apply for a warrant for Kinard's arrest. ECF No. 45-2 ¶ 32. Then almost a week passed before the arrest warrant was signed on November 18, without any apparent effort by the GPD to suggest that time was of the essence. ECF Nos. 37 ¶ 79; 45-2 ¶ 32; 45-26 at 3. And then they waited an additional week—until the eve of the Thanksgiving holiday—to request that NYPD officers detain Kinard. ECF Nos. 44-16 at 1; 45-2 ¶ 40; 45-28. All in all, the GPD officers waited eighteen days after Kinard informed them that he would not voluntarily turn himself in to detain him. And while this delay shows that Kinard was not considered a flight risk, bail was set at $100,000, and the prosecutor refused to consent to a reduction. One could reasonably infer from this series of events that GPD officers purposefully delayed proceedings and needlessly advocated for exceptionally high bail, resulting in Kinard spending Thanksgiving—a holiday that is traditionally spent with family— in custody. Indeed, as Justice Stevens observed in his *Baker* dissent, "one might regard the deprivation of liberty as particularly serious over [such] a holiday weekend, and require a higher standard of care at such a time." 443 U.S. at 155.

Significantly, the GPD officers were allegedly responsible for the unwillingness of Greenwich Assistant State Attorney Weiss to consent to lowering Kinard's bail by allegedly assuring him that they had "positively identified" Kinard as the person responsible for the criminal incident. ECF No. 45-4 ¶¶ 105–09; *cf. Taylor v. City of New York*, 2021 WL 848966, at *7 (E.D.N.Y. Mar. 4, 2021) (plaintiff

stated prolonged detention claim by alleging that if undisclosed exculpatory information had been presented to the judge, he would have been granted reasonable bail); *cf. Rodriguez v. City of New York*, 594 F. Supp. 3d 534, 547 (E.D.N.Y. 2022). But GPD officers never "positively identified" Kinard as the person they observed committing the crimes in question. The arrest warrant application states that the photographs of Kinard were only "consistent with the male observed" at the scene of the criminal incident. ECF No. 37-2 ¶¶ 5, 29. Indeed, even calling Kinard's appearance "consistent" with that of the man observed was a stretch. While both Kinard and the suspect the officers observed are men of color, Kinard does not have a distinct discoloration on his forehead that Officer Hall asserted he noted on the suspect. *Compare* ECF No. 44-3 ¶ 9 (Officer Hall's Decl.), *with* ECF No. 45-12 (photographs of Kinard).

From these facts, a jury could reasonably conclude that the defendants deliberately ignored Kinard's alibi evidence and instead misrepresented the strength of its case against him in order to extend Kinard's time in confinement—presumably as punishment for his initial refusals to submit to an interview with the GPD. *See Russo*, 479 F.3d at 210 (The act of "falsely describing the content" of evidence "combined with [the officers'] failure to investigate" the evidence "to see if [it] was in fact exculpatory, would readily support a jury finding of either intentional violation of, or deliberate indifference to [the plaintiff's] constitutional rights.");

*Harewood*, 2012 WL 12884356, at *7 (a reasonable juror could find that officer acted deliberately in continuing to detain the plaintiff without investigating his alibi when there was reason to suspect that the plaintiff was innocent).

And because there is sufficient evidence that the GPD officers acted, at the very least, with deliberate indifference to Kinard's constitutional rights, a reasonable juror could find that the defendants' actions "shock[ed] the conscience." *Russo*, 479 F.3d at 210. "The state of mind of a government defendant is an integral aspect of any 'shock the conscience' standard." *Id.* As Judge Calabresi observed in *Russo*, "while 'a purpose to cause harm' might be required in a situation such as a high-speed chase, 'deliberate indifference'—but not negligence—can support a finding of liability in situations where the government owes a special duty of care to those in its charge." *Id.* (quoting *O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005)). Here, the defendant GPD officers owed Kinard this special duty of care as long as he remained in police custody. Yet, while Kinard was incarcerated on Rikers Island, the defendants "fail[ed] to investigate the [visitor register] to see if [it] was in fact exculpatory" and instead falsely stated that they had positively identified Kinard as the culprit. *Id.* Because such conduct "would readily support a jury finding of either intentional violation of, or deliberate indifference to, [Kinard's] constitutional rights," Kinard has made a sufficient showing that the defendants' actions meet the "shock the conscience" standard. *Id.*

But while the evidence may be sufficient for this claim to survive summary judgment, genuine disputes of material fact remain, including whether Officer Hall or Sergeant Smith did falsely represent the strength of the evidence against Kinard to Weiss in order to prolong Kinard's detention with bail set at $100,000. Specifically, while Weiss' statement to Kinard's attorney of what he was told by the officers may be admissible to explain why he did not consent to the bail reduction, it is hearsay with respect to the issue of whether the statement Weiss attributed to unnamed GPD officers is true.

### B. The Individual Defendants

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). The defendants argue that Kinard has failed to satisfy this prerequisite for his prolonged detention claim because Kinard has "not allege[d] that any of the defendants transported him to Connecticut." ECF No. 44-1 at 13. But Kinard does not need to show that each individual defendant was personally involved in his transport to Connecticut to maintain a prolonged detention claim against them—only that each defendant "was personally involved" in the misrepresentations and investigatory failures that caused the unreasonable delay between Kinard's attorney providing the Greenwich police with the photograph of the exculpatory visitor

register and the reduction in bail that allowed for his release nine days later. *See Tortora v. City of New York*, 804 F. App'x 35, 37–38 (2d Cir. 2020) (summary order). I will consider each individual defendant in turn.

### i. Officer Michael Hall

Officer Hall seems to have had primary responsibility at the GPD for investigating Kinard's case. He initially contacted Kinard after the October 30, 2019 incident, prepared the arrest warrant, and then requested that the NYPD execute it. ECF Nos. 44-3 ¶¶ 5, 10, 15, 20, 25; 45-2 ¶¶ 15–16, 21, 27, 32, 40. He was also the officer who was in communication with NYC DOI Investigator Howard about verifying Kinard's alibi. ECF Nos. 44-13; 44-14; 45-2 ¶¶ 29, 50, 92.

According to Officer Hall's Declaration, Kinard's attorney informed him of the exculpatory evidence, including the visitor register showing that Kinard was completing a kitchen pickup in Brooklyn at the time of the crime, on November 26, 2019—the day after Kinard was incarcerated. ECF No. 44-3 ¶ 27. But Officer Hall waited almost a week to inform DOI investigator Howard of this evidence. ECF No. 44-14. Officer Hall made no other efforts to determine the location of the visitor register or otherwise confirm Kinard's alibi. Officer Hall's personal failure to reasonably investigate Kinard's readily verifiable claim of innocence was responsible, at least in part, for Kinard's unreasonably prolonged detention. This failure, along with Officer Hall's allegedly false representation that he had positively

identified Kinard, and the statement in the arrest warrant application that the photographs of Kinard were consistent with the male observed at the scene of the crime—notwithstanding that the photographs provided to him, as described earlier, do not depict a male with a distinct discoloration on his forehead—are sufficient to maintain a prolonged detention claim against him.

### ii. Sergeant James Smith

Sergeant Smith initially received the email from Kinard's attorney with the visitor register showing that Kinard was elsewhere at the time of the criminal incident. *See* ECF Nos. 49; 49-2 at 2; 45-2 ¶¶ 86–90. Sergeant Smith noted in a log dated November 26 that "[i]nformation was not provided as to where the hand written ledger page was from" but made no effort to obtain that information. ECF No. 45-24 at 1; *see* ECF No. 44-4. Sergeant Smith did inform Greenwich Assistant State Attorney Weiss that same day of the documents he had received from Kinard's attorney, ECF No. 44-4 ¶ 6, but the evidence suggests that Sergeant Smith may have been one of the officers who provided "assurances" to Weiss that "the Greenwich Police Department … had positively identified [Kinard] as the person who had committed the offenses charged," notwithstanding the fact that the arrest warrant application described Kinard's appearance as merely "consistent with" that of the man observed by the GPD officers. ECF Nos. 45-4 ¶ 109; 37-2 ¶ 29. Thus, there is

28

sufficient evidence of Sergeant Smith's personal involvement in Kinard's unreasonably prolonged detention to maintain this claim against him.

### iii. Officer Ryan Beattie and Officer C. Rosario

While Officers Beattie and Rosario played a role in Kinard's initial arrest by providing information that was used to secure the arrest warrant, there is no evidence that either of them was informed of the exculpatory evidence provided by Kinard's attorney or that they were involved in the misrepresentations made to Greenwich Assistant State Attorney Weiss about the strength of the case against Kinard. *See* ECF Nos. 44-5; 44-6; *see generally* ECF Nos. 37; 45-2. Because there is insufficient evidence of Officers Beattie and Rosario's involvement in the GPD's mishandling of the Kinard's case, summary judgment is granted to Officers Beattie and Rosario on this claim. *See Russo*, 479 F.3d at 211 (affirming dismissal of a prolonged detention claim against an officer where there was no evidence that he was aware of the exculpatory material).

### iv. Chief of Police Jim Heavey

Police Chief Heavey may be responsible for supervising the police officers who were involved in Kinard's arrest and detention, but he "may not be held liable simply because one or more of his subordinates committed a constitutional tort." *Russo*, 479 F.3d at 210–11. Because Kinard has not alleged, much less provided evidence of, Police Chief Heavey's involvement in any aspect of Kinard's detention,

summary judgment is granted to Police Chief Heavey on the prolonged detention claim. *See* ECF No. 37.

### C. Qualified Immunity

"Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Russo*, 479 F.3d at 211 (quoting *Poe v. Leonard*, 282 F.3d 123, 133 (2d Cir. 2002) (internal quotation marks omitted)). With respect to claims brought under Section 1983, as a threshold matter, "a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity." *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (quoting *Patterson v. City of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004)). Because issues of material fact remain as to the personal involvement of Officer Hall and Sergeant Smith in Kinard's prolonged detention, *see supra* Part II-A, as well as with respect to the intentionality prong of *Russo*, their motion for summary judgment is denied. *See Golino v. City of New Haven*, 950 F.2d 864, 868 (2d Cir. 1991) (citations omitted); *see also Johnson v. Jones*, 515 U.S. 304, 313 (1995).

### III.   Excessive Bail (Count 3)

The amended complaint alleges a § 1983 claim that the defendants violated Kinard's Eighth Amendment right to be free from excessive bail by setting bail at $100,000. ECF No. 37 ¶¶ 176–187. While the Individual Defendants—Officer Hall, Officer Beattie, Officer Rosario, Sergeant Smith, and Police Chief Heavey— did not set Kinard's bail directly, Greenwich Assistant State Attorney Weiss insisted on $100,000 bail based on the GPD officers' misrepresentation that they had "positively identified [Kinard] as the person who had committed the offenses charged." ECF Nos. 37-2 ¶ 29; 45-2 ¶ 32; 45-4 ¶ 109. Thus, Kinard contends that the $100,000 bail was set at the Individual Defendants' request and that they "took affirmative action to [e]nsure that bail was continued at the excessive amount of $100,000." ECF No. 37 ¶¶ 186–87.

Nevertheless, Kinard has not advanced, in his briefing, any argument in favor of his excessive bail claim. *See* ECF Nos. 45-1; 47. And, in any event, to the extent this claim was based on representations made to Weiss that the GPD had made a positive identification, it simply duplicates the prolonged detention claim. Under these circumstances, I grant defendants' motion for summary judgment on the excessive bail claim.

## IV.    Malicious Prosecution (Count 5)

Kinard's amended complaint alleges a common law claim for malicious prosecution. ECF No. 37 ¶¶ 196–200. While Kinard does not specify whether this claim is pursuant to New York or Connecticut state law, *id.*, I will assume as the defendants have, ECF No. 44-1 at 12, that Connecticut law applies because Kinard is suing Connecticut police officers for his prosecution pursuant to a Connecticut warrant for his arrest. *Cf. Heaney v. Purdy*, 272 N.E.2d 550, 551 (N.Y. 1971) (applying Ontario state law to a common law malicious prosecution claim where the allegation was that the defendant had used Ontario's "legal machinery maliciously."). "Under Connecticut law, a malicious prosecution claim requires proof that '(1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice.'" *Cornelio v. Connecticut*, 32 F.4th 160, 178 (2d Cir. 2022) (quoting *Spak v. Phillips*, 857 F.3d 458, 461 n.1 (2d Cir. 2017)).

"The existence of probable cause is a complete defense to a malicious prosecution claim." *Cornelio*, 32 F.4th at 178–79; *see Bhatia v. Debek*, 948 A.2d 1009, 1020 (Conn. 2008) ("The existence of probable cause is an absolute protection against an action for malicious prosecution, and what facts, and whether particular

facts, constitute probable cause is always a question of law."). Probable cause exists when the officer has "knowledge of facts sufficient to justify a reasonable [person] in the belief that he has reasonable grounds for prosecuting an action." *Bhatia*, 948 A.2d at 1020 (quoting *Zenik v. O'Brien*, 79 A.2d 769, 772 (Conn. 1951)). As the Supreme Court has explained, "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Illinois v. Gates*, 462 U.S. 213, 235 (1983) ("Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision."). "Although want of probable cause is negative in character, the burden is upon the plaintiff to prove affirmatively, by circumstances or otherwise, that the defendant had no reasonable ground for instituting the criminal proceeding." *Bhatia*, 948 A.2d at 1020.

While this may be a close case, Kinard has not met this burden. GPD officers observed a vehicle, which they already had reason to suspect was involved in a fraudulent money order scheme, commit multiple criminal offenses in front of them—including reckless driving and disobeying the command of a safety officer. ECF No. 45-2 ¶¶ 2, 5–6, 10–13. GPD officers discovered that a vehicle with that same license plate had been previously stopped multiple times and that the person operating the vehicle had been ticketed under the name "Tramaine Kinard." *Id.* ¶ 16. The evidence Officer Hall had that Kinard had not committed the crimes in question

included Kinard's statement that he had been at work in Brooklyn that day, that the car was not registered in Kinard's or anyone else's name, and Kinard's timesheet indicating that he had worked from 7:00 A.M. to 3:30 P.M. on the date of the incident. ECF Nos. 37-2 ¶ 30; 44-13 at 1. Since Kinard lived and worked in Brooklyn and could have reasonably driven from Brooklyn to Greenwich and back between 7:00 A.M. and 3:30 P.M., this evidence was not sufficient to undermine the probable cause showing in the affidavit in support of the warrant. *See* ECF No. 45-2 ¶ 28; *see also Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571–72 (2d Cir. 1996).

Kinard argues that even if there was probable cause for instituting the prosecution against him, the showing was lacking because Officer Hall lied in the arrest warrant application when he stated that the photographs Kinard provided of himself to law enforcement were "consistent with the male observed operating the Infiniti that fled from GPD officers." ECF No. 37-2 ¶ 31; *see* ECF No. 47 at 22–23. Because the photos of Kinard do not have the same "distinct discoloration on [the] forehead" that Officer Hall had noted on the person he observed committing the crime, Kinard alleges that Officer Hall knowingly misrepresented that Kinard looked like the criminal suspect. ECF Nos. 45-1 at 31–32; 47 at 22–23; *see* ECF Nos. 44-3 ¶ 9; 45-12. But even if this were the case, Officer Hall's inaccurate statement about Kinard's appearance being consistent with that of the suspect he observed was not "necessary to the finding of probable cause." *Golino*, 950 F.2d at 870 (quoting

*Franks v. Delaware*, 48 U.S. 154, 155–56 (1978)). "The ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (internal quotation marks omitted).

The evidence that a person identifying himself as "Tramaine Kinard" had been ticketed multiple times in a vehicle with the same license plate number as that observed at the crime scene provided a reasonable ground for instituting a criminal proceeding.[6] Indeed, the significance of the three stops is underscored by the fact that, as Officer Hall reasonably assumed, "an NYPD officer … would … verify an ID presented at a traffic stop[, and] [h]ere, the ID was accepted as plaintiff at three separate stops conducted by three separate NYPD officers." ECF No. 44-3 ¶ 11. Moreover, the application for the arrest warrant also states that on the day that the

---

[6] In his declaration in support of defendants' summary judgment motion, Officer Hall also states that, according to the Vehicle Snapshot he obtained from the NYPD before applying for the arrest warrant, he observed that "[n]otably, the October 2018 ticket to a person identified as Tramaine Kinard in the Vehicle occurred at 771 Monroe Street, which is Plaintiff's address." ECF No. 44-3 ¶ 7. In his own declaration, Kinard's attorney responds to this assertion by noting that "[t]he 'Vehicle Snapshot' shows two addresses linked to ticket # B18E017877, issued on 10/5/2018 [and that] [o]bviously, the same ticket was not issued at two separate locations, in two different boroughs. The ticket issued to the operator of the vehicle identified as plaintiff on October 5, 2018, was for an offense occurring at "Bruckner Boulevard &&[*sic*] Pugsley Avenue" in the Bronx." ECF No. 45-4 ¶ 69. While the Vehicle Snapshot does in fact list two addresses for the moving violation on October 5, 2018, it was not unreasonable for Officer Hall to have understood from this document that this violation occurred at occurred at 771 Monroe Street—where he knew Kinard lived. *See* ECF Nos. 44-10 at 3 (NYPD Vehicle Snapshot); 45-12 (photograph of Kinard's driver's license sent to Officer Hall providing Kinard's home address as 771 Monroe Street).

suspect fled from the GPD officers, there was a "hit" on the vehicle in question from a license plate reader in Canarsie, Brooklyn—the borough in which Kinard lived and worked—at approximately 5:00 p.m. ECF No. 37-2 ¶ 28. And, in light of this evidence, the lack of discoloration on Kinard's forehead does not undermine the showing of probable cause. *See Martinez v. City of New York*, 340 F. App'x 700, 701–02 (2d Cir. 2009) (summary order) (noting that probable cause existed for the arrest of "an individual based on a mistaken identification" even though there were minor discrepancies between the plaintiff's physical appearance and the warrant's description of the suspect's "skin tone, height, and weight."); *cf. Gisondi v. Town of Harrison*, 72 N.Y.2d 280, 285 (1988) (remarking that "[i]n any investigation the police are likely to encounter discrepancies, particularly in cases involving eyewitness identification," and that police are "not required to disclose all discrepancies … uncovered during the investigation" when applying for an arrest warrant).

Of course, the issue of whether summary judgment is appropriate on the defendants' "duty to investigate specific, readily-verifiable claims of innocence in a reasonable time period," *Russo*, 479 F.3d at 210, which is addressed above, is separate from Kinard's common law malicious prosecution claim.[7]

---

[7] Kinard and the Defendants seem to be under the impression that Kinard has brought a § 1983 claim for malicious prosecution, *see* ECF Nos. 44-1 at 12 ("Plaintiff's *Federal* and State Law Malicious Prosecution Claims Fail as a Matter of Law") (emphasis added); 47 at 22–23 (citing

## V.    False Arrest and False Imprisonment (Counts 4 and 6)

Kinard's amended complaint alleges a § 1983 claim for false arrest and unlawful imprisonment, as well as a common law claim for false arrest and false imprisonment. ECF No. 37 ¶¶ 188–95, 201–05. The Second Circuit has said that courts should "look[] to the law of the state in which the arrest occurred" for § 1983 false arrest claims and Kinard was technically arrested in New York. *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004). Nevertheless, neither party has expressed a position as to whether New York or Connecticut law should apply as to either the § 1983 or the state common law false arrest and unlawful imprisonment claims. *See* ECF Nos. 37 ¶¶ 201–05; 44-1 at 8–11; 45-1 at 31–32; 46 at 18–20. Because there is no difference between the laws of those two states, there is no need to engage in a choice of law analysis.

Consequently, whether Kinard's § 1983 and common law claims for false arrest and false imprisonment are analyzed under New York or Connecticut law, they cannot proceed if Kinard was arrested pursuant to a facially valid arrest warrant, unless the information provided in the affidavit in support of the warrant is knowingly and materially false. *See Franks*, 438 U.S. at 171–72. And as noted above in the discussion of malicious prosecution, the affidavit was sufficient to establish

---

various § 1983 case law in support of Kinard's malicious prosecution claim), but such a claim is nowhere to be found in Kinard's amended complaint. *See* ECF No. 37. In any case, a § 1983 claim would fail for the same reason as Kinard's common law claim.

probable cause for Kinard's arrest notwithstanding Officer Hall's inaccurate statement about Kinard's appearance.

## VI.   Municipal Liability (Count 7)

Kinard's amended complaint alleges a § 1983 claim against the Town of Greenwich, the GPD, and Police Chief Heavey for negligence in training, supervising, hiring, and retention of the police officers involved in this case. ECF No. 37 ¶¶ 206–10. Because "[a] municipality and its supervisory officials may not be held liable in a § 1983 action for the conduct of a lower-echelon employee solely on the basis of respondeat superior," Kinard "must show that the violation of his constitutional rights resulted from a municipal custom or policy" to hold these municipal defendants liable. *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 122 (2d Cir. 1991).

Only one of Kinard's § 1983 claims has survived summary judgment—his prolonged detention claim. Because municipal liability only applies if there is a viable underlying constitutional violation, Kinard can hold the Town of Greenwich, the GPD, and the Police Chief Heavey liable only if he can show that they were responsible for his unreasonably prolonged detention. *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). Specifically, he must show that "a policymaking official ordered or ratified" Officer Hall's and Sergeant Smith's mishandling of exculpatory material to prolong Kinard's detention, or that a policymaking official

was deliberately indifferent to this unconstitutional act. *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012).

Kinard has not alleged that any policymaking officials ordered or ratified Officer Hall's and Sergeant Smith's actions in this case, *see generally* ECF No. 37, so he must instead demonstrate that policymaking officials for the Town of Greenwich or the GPD were deliberately indifferent to GPD officers' mishandling of exculpatory evidence. "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1997) (internal quotation marks omitted). Indeed, the "demonstration of deliberate indifference requires a showing that the official made a conscious choice, and was not merely negligent." *Jones*, 691 F.3d at 81. Kinard has failed to make such a showing.

While Kinard has generally alleged that the GPD was negligent in its training, supervising, and hiring processes, the only evidence he presents of this is that Officer Hall has since been promoted to the rank of detective. ECF Nos. 37 ¶¶ 206–210; 47 at 25; *see also* ECF No. 44-3 ¶ 2. Kinard has not provided any other evidence of inadequacies in the GPD's training program, hiring processes, or management policies, nor has he offered any evidence of a "causal relationship between those inadequacies and the alleged constitutional violations." *Amnesty Am. v. Town of W.*

*Hartford*, 361 F.3d 113, 129 (2d Cir. 2004). Instead, he focuses on the "single incident alleged in [his] complaint" that "involved only actors below the policy-making level." *Ricciuti*, 941 F.2d at 123. Kinard's "evidence falls far short of establishing a practice that is 'so persistent or widespread' as to justify the imposition of municipal liability." *Giaccio v. City of New York*, 308 F. App'x 470, 472 (2d Cir. 2009) (summary order) (quoting *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006)). Indeed, Kinard's allegations of the GPD's institutional inadequacies are so sparse that allowing his municipal liability claim to proceed would in essence be imposing "*de facto respondeat superior* liability" on the institutional actors in this case. *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

## CONCLUSION

The defendants' motion for summary judgment on Kinard's § 1983 claims for unlawful identification procedures, excessive bail, false arrest, and municipal liability, as well as Kinard's common law claims for malicious prosecution and false arrest is GRANTED. The defendants' motion for summary judgment on Kinard's § 1983 claim for prolonged detention is GRANTED as to defendants Beattie, Rosario, and Heavey but DENIED as to defendants Hall and Smith, with the caveat that it was denied without prejudice to renew after additional discovery that I had indicated was necessary. *See* ECF No. 55 Oral Arg. Tr. at 40:19-41:5. Kinard's motion for summary judgment is DENIED.

**SO ORDERED.**

*Edward R. Korman*

Brooklyn, New York
January 27, 2023

Edward R. Korman
United States District Judge